**TOWN & COUNTRY EQUIPMENT, INC., a Tennessee Corporation, plaintiff,**

**v.**

**DEERE & COMPANY, INC., an Illinois Corporation, dba John Deere Company, Defendant.**

**No. 99–1118.**

United States District Court, W.D. Tennessee, Eastern Division.

Sept. 11, 2000.

James I. Pentecost, Waldrop & Hall, Jackson, TN, J. Michael Dady, W. Michael Garner, Jeffery S. Haff of Dady & Garner, Minneapolis, MN, for plaintiff.

William O. Luckett, Jr., Lorrie K. Ridder, David A. Billions, Rossie, Luckett, Parker & Ridder, Memphis, TN, for defendant.

## ORDER PARTIALLY GRANTING AND PARTIALLY DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TODD, District Judge.

Plaintiff, Town & Country Equipment, Inc. (T & C), filed this action against defendant Deere & Company, Inc. d/b/a John Deere Company, alleging that Deere wrongfully forced T & C out of business as a Deere dealer. Plaintiff asserts claims under Tennessee law for breach of contract and the implied covenant of good faith and fair dealing, tortious interference with present and prospective business advantage, and violation of the Tennessee Consumer Protection Act, Tenn.Code Ann.

§ 47–18–101 *et seq.* Plaintiff also asserts a claim for violation of the Robinson–Patman Act, 15 U.S.C. § § 13, 15. Plaintiff seeks damages in excess of $75,000; therefore, the Court has both federal question jurisdiction and diversity jurisdiction. 28 U.S.C. § § 1331, 1332. Before the Court is a motion for summary judgment on behalf of the defendant, to which plaintiff has filed a response.

Motions for summary judgment are governed by Fed.R.Civ.P. 56. If no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Fed.R.Civ.P. 56(c). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party may not rest upon the pleadings but must go beyond the pleadings and "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548.

"If the defendant ... moves for summary judgment ... based on the lack of proof of a material fact, ... [t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter but only to determine whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. 2505. Rather, "[t]he inquiry on a summary judgment motion ... is ... 'whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law.'" *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505). Doubts as to the existence of a genuine issue for trial are resolved against the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

T & C's claims are based primarily on allegations that Deere unreasonably denied a request to relocate the dealership to a more favorable location, permitted T & C's competitors to obtain multi-unit pricing on single-unit order while denying T & C that right, imposed unreasonable performance criteria on T & C, and forced T & C, under threat of termination, to sell its dealership to a buyer chosen by Deere at a price significantly below fair market value. Deere contends that there are no genuine issues of material fact for trial on any of T & C's claims.

The evidence in the record shows the following undisputed facts. In 1990, David Cash acquired T & C, a business that sold Deere's consumer products line, such as lawn mowers. The business was located in Jackson, Tennessee. David Cash had been a Deere dealer in the Jackson area since 1966, and operated a separate business called D & C Tractor that sold all three of Deere's product lines, consumer, agricultural and construction. Upon the acquisition of T & C, David Cash functioned as the general manager of D & C Tractor, and his son, Mike Cash, functioned as the manager of T & C. (D. Cash Dep. at 9–12, 14–16.)

In 1991, David Cash was asked by R.T. Maynard, Branch Manager for Deere, to consolidate his consumer and agricultural product lines at the T & C location. (D. Cash Dep. at 14–15.) After considering the proposal, Cash and his son agreed, and T & C entered into a written Deere Agricultural Dealer Agreement in late May/early June, 1991. (Def.'s Mot., Ex. B.) From that point through the end of

1995, Deere expressed no concerns about T & C's performance.

By letter to Mike Cash dated February 2, 1996, J.V. Shelton, Deere's Division Sales Manager at that time, notified T & C that its 16% market share for the sale of agricultural products was below the desired 20% level. Shelton advised that Deere did not believe T & C was fulfilling the requirements of the Agricultural Dealer Agreement.[1] (Def.'s Mot., Ex. C.).

In late May 1997, Jim Broyles, who was then the Division Sales Manager, notified David and Mike Cash by letter that T & C's final market share figure for 1996 was still below the minimum 20% level. (Def.'s Mot., Ex. D.) A meeting was also held to discuss the situation, at which Broyles, David Cash, Mike Cash and Darrell Hicks were present. (Def.'s Mot., Ex. G.) In his letter, Broyles emphasized that a 20% market share was required, and must be achieved by the end of 1999. A written action plan was requested Broyles also advised that if T & C did not wish to continue as a John Deere dealer, the company would work with them to find a buyer. (Def.'s Mot., Ex. D.)

During the May meeting, David and Mike Cash requested that T & C be permitted to relocate to where David Cash had previously operated a dealership, and still owned the property. After looking at the proposed location, Broyles rejected the request in a letter dated June 16, 1997, stating that he believed the move would be detrimental to T & C's consumer product line. (Def.'s Mot., Ex. G.) However, Hicks testified that, in his opinion, the move would have been better for the agricultural product line. (Hicks Dep. at 80.)

During this time period, both David Cash and Mike Cash complained to Hicks and Broyles that it would be difficult to reach a 20% market share while Deere was permitting other dealers in the area, particularly Pryor Implement in Trenton, Tennessee, to obtain substantial discounts on fraudulent "multi-unit" orders. (D. Cash Dep. at 24–28, 44; M. Cash Dep. at 16–28.) Subsequently, David and Mike Cash decided to sell T & C, and informed Deere of that decision in a letter dated September 4, 1998. The letter stated that Hicks had informed David and Mike Cash that T & C would receive a termination letter from Deere in July 1999, stating the company's intention to cancel the dealer contract by the end of 1999. The letter also requested Deere's assistance in finding a suitable buyer. (Def.'s Mot., Ex. H.) On December 22, 1998, Deere approved the sale of T & C to Tennessee Tractor, LLC, for a sum that was allegedly far below fair market value and less than the appraised asset value. (Def's. Mot., Ex. 1.)

## BREACH OF CONTRACT

■ Deere contends that it is entitled to judgment as a matter of law on T & C's claims for breach of contract and breach of the implied covenant of good faith and fair dealing because Deere acted pursuant to express contractual rights contained in the dealership agreement.

■ Under Tennessee law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn.Ct.App.1995). *See also Lawhorn & Assoc., Inc. v. Patriot Gen. Ins. Co.*, 917 F.Supp. 538, 543 (E.D.Tenn.1996). "What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction that is fair and reasonable." *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn.Ct.App.1987). In at least one Tennessee decision, it was noted that there was no breach of the duty of good

---

1. Deere states that Shelton also advised T & C that its "customer satisfaction index" was also below average. However, the February, 1996 letter from Shelton to T & C addresses only market share, not deficiencies in customer satisfaction.

faith and fair dealing when a party performed as it was "specifically allowed" by the contract. *Bank of Crockett v. Cullipher*, 752 S.W.2d 84, 91–92 (Tenn.Ct.App. 1988). In this case, however, Deere has failed to show, as a matter of law, that it performed as specifically allowed by the dealer agreement.

T & C alleges that Deere breached the dealer agreement by unreasonably rejecting its proposal to relocate the business. Deere, however, argues that it had an absolute contractual right to withhold its approval of any relocation, for any reason. This is not borne out by the express terms of the agreement, which provides only that the dealer may not operate the business at any other location *without prior written approval of the Company.* (Agreement § 1(j).) Relocation without prior approval is grounds for immediate cancellation of the agreement. *Id.* § 2(c). Nothing in the agreement suggests that Deere may withhold that approval unreasonably.

The evidence in the record shows that there is a genuine issue of material fact regarding whether Deere acted reasonably in denying T & C's request to relocate. Broyles, in his letter of June 16, 1997, expressed concern that T & C's consumer product line would be compromised by the move because the proposed location was "out of the way" of Jackson's retail growth area, which was to the north. However, there is also evidence that there was never a problem with the performance of T & C's consumer product line and that there were two other successful lawn and garden dealers near the proposed location. In addition, as stated previously, Hicks testified that he thought the proposed location would be better for the agricultural product line that Deere was primarily concerned about.

Deere also contends that it did not breach the dealer agreement by allegedly failing to ensure that T & C was allowed to receive the same discounts for multi-unit orders as other area dealers received. Deere, however, points only to evidence that Deere obtained at least three sales through the multi-unit pricing program to support its assertion that T & C was allowed "full access" to the program. The agreement provides:

> The Company agrees that Dealer will have the benefit of any Finance Plans, Lease Plans, Floor Plans, Parts Return Programs, Sales or Incentive Programs or similar plans or programs which it, from time to time, makes available to other Authorized Agricultural Dealers. Such plans or programs may contain standards, conditions or requirements of uniform application which the Dealer must meet in order to use or benefit from them. . . .

(Agreement, § 1(b).) The Agricultural Dealer Terms Schedule provides that sales eligible for multiple unit bonuses must be "to a single retail customer who is the end user." (Pl.'s Resp., Ex. 2.).

The essence of T & C's claim is that Deere knowingly allowed other area dealers, specifically Pryor Implement, to receive discounts on multiple-unit sales that were falsely submitted as being made to a single end user, but did not allow T & C to engage in this practice. That is, Deere allegedly breached the agreement either by failing to apply the multi-unit program uniformly, or by offering a different, "unofficial" program only to certain dealers.

The evidence in the record shows that there is a genuine issue of material fact regarding whether Deere knew the multi-unit program was being administered so that T & C was denied advantages that other dealers were given. Both David Cash and Mike Cash complained to Hicks and Broyles about the failure to adequately enforce the program as to Pryor Implement. However, Hicks looked into only one particular sale by Pryor, which was improper, but determined that no further audit was necessary. (Hicks Dep. at 41–44.) Furthermore, David Cash testified that when he told Hicks that T & C also should be able to do multi-unit sales that

were not to a single end user, Hicks told him that if T & C submitted such sales, Deere could terminate the agreement, charge the discount back to the dealership, or both. (D. Cash Dep. at 24–25.)

■ Deere also contends that it is entitled to judgment as a matter of law on T & C's claim that Deere breached the agreement by imposing unreasonable performance criteria. Deere points to a provision of the agreement obligating the dealer to "achieve sales objectives and market penetration within Dealer's Area of Responsibility satisfactory to the Company." (Agreement, § 1(d).) However, the agreement also provides:

> The Dealer's appointment may be terminated at any time:
>
> . . . . .
>
> (b) by written notice given by the Company to the Dealer at least one hundred eighty (180) days prior to the effective date specified in such notice . . . if the Company believes the Dealer is not fulfilling the requirements of his appointment despite the opportunity to correct or to take appropriate action toward correcting deficiencies in his operations which have been called to his attention by the Company;

(Agreement, § 3(b).)

In support of its position, Deere merely points to evidence that T & C's market share was below the desired 20% level, and that T & C was notified of this problem yet failed to correct the deficiency.[2] However, T & C maintains that Deere failed to give a reasonable opportunity to take appropriate corrective action. Specifically, T & C argues that Deere's unwarranted denial of its request to relocate, and the failure to uniformly apply the multi-unit pricing program frustrated efforts to improve its market share, thus rendering the 20% requirement unreasonable. The factual disputes as to these issues also preclude summary judgment on the issue of whether the performance criteria were unreasonable.

■ T & C also alleges that Deere breached the agreement by unreasonably withholding approval of the sale of the dealership except to a particular buyer chosen by Deere. The agreement specifically provides that the dealer cannot assign the agreement without the prior written consent of the company. (Agreement, § 14.) However, the agreement does not give Deere the right to unreasonably limit or interfere with the sale.

Deere argues that David and Mike Cash chose to sell T & C to Tennessee Tractor, and that Deere merely approved the sale. Glenn Sears, the Sales Branch Manager at the time, gave approval for the sale in a one-sentence letter dated December 22, 1998. However, there is evidence in the record that Tennessee Tractor already owned an existing dealership, and that Deere wanted to consolidate its dealerships so that fewer principals would be involved. (D. Cash Dep. at 39–43.) There is also evidence that when T & C made the decision to sell, Broyles told Hicks that he was to notify all the neighboring dealers, and that he was to stay out of the negotiations. This instruction was given because Broyles had heard a rumor that Hicks was going to be hired by Tennessee Tractor after his retirement from Deere. (Broyles Dep. at 77–80.) Hicks testified that he did, indeed, have an expectation that, following his retirement from Deere, he would serve as general manager of Tennessee Tractor. (Hicks Dep. at 82–84.) Nevertheless, there is also evidence that Hicks was involved in the negotiations, and actually told Danny Marbury, one of the principals of Tennessee Tractor, that T &

---

**2.** In its argument, Deere again states that J.V. Shelton's letter of February 2, 1996, indicated that T & C's customer satisfaction index was below the area average. Broyles also testified that Shelton identified a deficiency with customer satisfaction. (Broyles Dep. at 65.) However, as the Court pointed out in note 1, *supra.* Shelton's letter contains no references at all to any customer satisfaction index. In addition, Broyles testified that he did not personally advise T & C of any problems in that area. (Broyles Dep. at 65–67.)

C would have to sell at a depressed value or Deere would terminate the dealership. (D. Cash Dep. at 60–75.)

Clearly, there are genuine issues of material fact regarding whether Deere unreasonably limited or interfered with T & C's efforts to sell the dealership.

## INTERFERENCE WITH PRESENT AND PROSPECTIVE BUSINESS RELATIONS

■ Plaintiff's claim for interference with prospective business relations, or prospective economic advantage, is clearly foreclosed by the Tennessee Supreme Court's decision in *Nelson v. Martin,* 958 S.W.2d 643, 645–46 (Tenn.1997), which squarely held that such a claim does not state a cause of action under Tennessee law. The more thorny issue, however, is whether there is a separate cause of action in Tennessee for interference with present business relations, or present economic advantage.

Part of the difficulty comes from decisions in which the Tennessee courts have simply discussed the tort of interference with "business relations" without specifying whether those business relations are "prospective" or "present." For example, in *Kan Constr. and Cleaning Corp. v. Tatum,* No. 01A01–9304–CV–00150, 1993 WL 434741, at *4 (Tenn.Ct.App. Oct. 27, 1993), the Tennessee Court of Appeals stated:

> In *Nashville Mem'l Hosp., Inc. v. Binkley,* 534 S.W.2d 318 (Tenn.1976) our supreme court recognized the tort of interference with business relations.... The Binkley court said: Everyone has the right to establish and conduct a lawful business or engage in a lawful profession, and is entitled to the protection of organized society, through its courts, whenever that right is unlawfully invaded. An actionable wrong is established against anyone who is shown to have intentionally interfered with that right, without justifiable cause or excuse.... Furthermore, it is not necessary to expressly allege malice so long as it is

alleged that the damage was done by the defendants intentionally and without legal justification, for malice is inferred from such allegations. *Id.* at 321 (citations omitted).

The *Kan* Court went on to set out the elements of the tort of interference with business relations as: (1) the existence of a business relationship or expectancy (an existing contract is not required); (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional act of interference; (4) proof that the interference caused the harm sustained; and (5) damage to the plaintiff. *See also, Lee v. Strickland,* No. 03A01–9806–CH–00195, 1999 WL 233395, at *2–3 (Tenn.Ct.App. Apr. 16, 1999); *New Life Corp. of Am. v. Thomas Nelson, Inc.,* 932 S.W.2d 921, 927 (Tenn.Ct.App.1996).

The elements set out in *Kan, New Life Corp.* and *Lee* for the tort of interference with business relations are the very same elements that the Tennessee Supreme Court in *Nelson* recognized as being the elements that "generally are found to constitute a cause of action for wrongful interference with a *prospective* economic advantage" (emphasis added). 958 S.W.2d at 645 n. 3 (citing *Quality Auto Parts v. Bluff City Buick,* 876 S.W.2d 818, 823 (Tenn. 1994)). *See also Price & Price Mechanical, Inc. v. Hale,* No. 03A01–9612–CH–00402, 1997 WL 367453, at *1 (Tenn.Ct. App. July 2, 1997).

Even in a case which suggests there are two separate causes of action, the answer is no clearer. In *Collins v. Greene County Bank,* 916 S.W.2d 941 (Tenn.Ct.App.1995), the Tennessee Court of Appeals stated:

> The Trial Court concluded the disintegration of the business relationship was prospective and there is no cause of action in Tennessee for tortious interference with a prospective business relationship. There are disputed issues of material fact as to whether the alleged interference was with an existing business relationship. Accordingly, it is ap-

propriate to remand this case for a determination of whether the elements of this tort exists.

*Id.* at 946–47. The Court then lists the elements of the tort of interference with an existing business relationship. *Id.* at 947 n. 3. Again, the elements are exactly the same as those set out in *Nelson* for the tort of interference with *prospective* economic advantage. Accordingly, this Court is inclined to agree with the statement of the Tennessee Court of Appeals, made prior to the decision in *Nelson,* in *Overland Indus. Lubricant Corp. v. City of Waynesboro,* No. 01–A–01–9412–CH00602, 1996 WL 47935 (Tenn.Ct.App. Feb. 7, 1996):

> The tort of interference with business relations is of uncertain validity in Tennessee. While the Supreme Court in *Hutton v. Watters,* 132 Tenn. 527, 179 S.W. 134 (1915), recognized a tort for intentional interference with business relations, the court in the recent case of *Quality Auto Parts v. Bluff City Buick,* 876 S.W.2d 818 (Tenn.1994), distinguished *Hutton v. Watters* and said that the tort of intentional interference with prospective economic advantage has never been expressly recognized in this state. It is possible that there are two separate torts, but we think they seek to accomplish the same purpose: redress for the harm caused by interference with one's business.

*Id.* at *2.

■ In any event, absent a clearer pronouncement from the Tennessee courts on whether there is a separate cause of action for interference with a present business relationship and, if so, the elements of any such cause of action, this Court is reluctant to hold that T & C has stated a claim upon which relief may be granted; therefore, Deere's motion for summary judgment will be granted on this issue.

ROBINSON–PATMAN ACT

■ T & C has alleged that Deere violated the Robinson–Patman Act (the Act), 15 U.S.C. § 13(a). That section provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. ...

■ T & C alleges that by allowing Pryor Implement to obtain multi-unit discounts on equipment that was sold to multiple end users while not allowing T & C such discounts, Deere violated the prohibition on discriminatory pricing and injured competition between T & C and Pryor. In order to establish a violation of the Act, T & C must prove: (1) that Deere's sales to Pryor were made in interstate commerce; (2) that the equipment sold to Pryor was of the same grade and quality as that sold to T & C; (3) that Deere discriminated in price between T & C and Pryor; and (4) that the discrimination had a prohibited effect on competition. *Texaco, Inc. v. Hasbrouck,* 496 U.S. 543, 556, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990).

Deere maintains that this is not a case of price discrimination, and that there is no evidence suggesting that Deere sold equipment to other dealers at prices lower than it sold equipment to T & C. However, the record does show at least some evidence that Deere knowingly gave Pryor Implement multi-unit discounts on equipment that was ultimately sold to more than one end user, while stating that any attempt by T & C to obtain discounts in the same manner would be rejected, and would sub-

ject the dealership to possible termination. The fact that Deere's official policy states that multi-unit discounts may be given only for equipment sold to a single end user is not dispositive, if Deere's actual practice was, in fact, to allow only certain dealers to violate the policy. Therefore, Deere is not entitled to judgment as a matter of law on this claim.

### TENNESSEE CONSUMER PROTECTION ACT

 T & C's final cause of action is pursuant to the Tennessee Consumer Protection Act (TCPA), Tenn.Code Ann. § 47–18–104(b)(11), (12). These provisions prohibit, as unfair or deceptive acts:

> (11) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; and
>
> (12) Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law.

Again, T & C maintains that Deere's official representations concerning the multiunit pricing program were false or misleading because for certain dealers, particularly Pryor Implement, the multi-unit discounts were actually available even when the equipment was sold to multiple end users. T & C also maintains that this practice renders deceptive Deere's representation in the dealer agreement that it would make available to T & C all sales or incentive programs that were made available to other dealers. (Agreement, § 1(b).)

Deere argues that it cannot be held responsible for Pryor Implement's abuse of the multi-unit pricing program because Pryor is not an agent of Deere. However, as stated previously, there is some evidence in the record that Deere was aware that Pryor Implement was submitting invalid multi-unit orders but allowed the practice to continue, while preventing T & C from doing the same. While the evi-

dence is not overwhelming, it is sufficient to preclude judgment as a matter of law on the TCPA claim.

In conclusion, the Court hereby GRANTS Deere's motion for summary judgment on T & C's claims for interference with present and prospective business relations, and DENIES the motion in all other respects.

IT IS SO ORDERED.