IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 3, 2011 Session

# DICK BROADCASTING CO., INC. OF TENNESSEE v. OAK RIDGE FM, INC., ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 150482-3      Michael W. Moyers, Chancellor**

---

**No. E2010-01685-COA-R3-CV-FILED-OCTOBER 19, 2011**

---

The plaintiff filed suit against the defendants for causes of action sounding in contract after the defendants refused to consent to the assignment of certain agreements relating to the programming of a radio station. The parties filed competing summary judgment motions. The trial court dismissed the case, finding as a matter of law that the defendants did not breach one of the contracts at issue. The plaintiff appealed. We reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

John A. Day, Brandon E. Bass, and Burke Keaty, Brentwood, Tennessee, for the appellant, Dick Broadcasting Co., Inc. of Tennessee.

Robert S. Stone, Knoxville, Tennessee, for the appellees, Oak Ridge FM, Inc. and ComCon Consultants.

John A. Lucas, Alcoa, Tennessee, for the appellee, John W. Pirkle.

**OPINION**

**I. BACKGROUND**

In 1997, the plaintiff, Dick Broadcasting Company, Inc. ("DBC") entered into three contracts with the defendants, Oak Ridge FM, Inc., ComCon Consultants ("ComCon"), and

John W. Pirkle (collectively "the Pirkle Entities"), to program WOKI-FM, a radio station in Oak Ridge, Tennessee.  The first contract, the Time Brokerage Agreement ("the TBA"), granted DBC the right to program WOKI-FM for seven years and to purchase substantially all of the broadcast time on the station.  The TBA contained the following language:

> 15:10.  *Binding Agreements; Successors and Assigns*.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective Successors and assigns, including, without limitation, any assignee of the FCC licenses for the Stations.

The second contract, the Right-of-First-Refusal Agreement ("the ROFR"), granted DBC a right of first refusal to purchase substantially all of the assets used in the operation of WOKI-FM.  The ROFR's provision regarding assignment states:

> 7.     Assignment.  This First Refusal Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns . . . .  No party may assign its rights, interests or obligations hereunder without the prior written consent of the other party, and any purported assignment without such consent shall be null and void and of no legal force or effect; provided, however, that DBC shall be permitted to assign its rights and obligations under this First Refusal Agreement (1) to an entity controlled by James Allen Dick Jr., or by any one or more of the Dick family shareholders of DBC, or (2) to another entity provided that DBC shall be prevented from performing this First Refusal Agreement and provided that DBC shall guarantee the obligations of such other entity as DBC's assignee hereunder. . . .

The third contract, the Consulting Agreement ("the CA"), contracted for ComCon (comprised of Mr. Pirkle and his son) to provide part-time consulting service regarding WOKI-FM during the term of the TBA.  The CA noted:

> 9. **Amendment**.  No amendment, change or variance from this Agreement shall be binding on either party hereto unless executed in writing and signed by both parties hereto.

In its "Governing Law" section, the CA provided "[t]his Agreement shall be binding on the parties hereto and their successors and assigns."  These three agreements will be collectively called "the WOKI Agreements."

In early 2000, DBC and its related companies decided to sell most of their interests in radio stations. After soliciting bids, DBC decided to sell its assets to Citadel Broadcasting Company ("Citadel"). In March 2000, Citadel agreed to pay DBC a total purchase price of $300,000,000, and set a closing date approximately five months later for the parties to complete their due diligence and meet the conditions and requirements of the agreement. DBC entered into a written Asset Purchase Agreement with Citadel effective April 30, 2000. The sale was to include the assignment of the WOKI Agreements.

DBC observes that the Pirkle Entities knew on March 8, 2000, of the possible sale of DBC's assets. On that date, an Inside Radio article provided first notice that DBC was for sale and that Citadel was bidding for it. Twenty days later, a Knoxville News Sentinel article ran in the business section entitled, "Dick Broadcasting is FOR SALE," specifically setting forth the radio properties "on the block," including WOKI-FM. On May 10th, 2000, the Knoxville News Sentinel reported "Dick Broadcasting sells 11 Stations," and that

> Citadel will add to its portfolio . . . one AM and four FM Stations (one of which is operated under a long-term local market agreement) in Knoxville, the 69th largest market. Other local stations are WNOX-AM and FM and WSJM-FM and WOKI-FM.

However, despite this notice, DBC notes that at no time after March 8, 2000, did Mr. Pirkle contact any representative of DBC regarding the asset sale or the reported inclusion of WOKI-FM in the sale.

According to Mr. Pirkle, when the Pirkle Entities learned about the proposed assignment of the WOKI Agreements to Citadel, he opined to DBC that none of the contracts were assignable without consent. In an affidavit, Mr. Pirkle related as follows:

> 7. . . . In these communications [to DBC], I stated that I would not agree to assign the Time Brokerage Agreement and Right-of-First- Refusal Agreement to Citadel without additional consideration. I do not recall DBC making a specific request to assign the Consulting Agreement to Citadel.
>
> 8. I refused to consent to the assignment based on the legal opinion from counsel and my belief that ORFM and ComCon had contract rights in the assignment of WOKI Agreements for which they should be paid. It was my intent in my negotiations with DBC to obtain the greatest economic benefit for ORFM and ComCon as consideration for their consent to assign the WOKI Agreements.

9. At some point during my negotiations with DBC, I made the decision to refuse to agree that the WOKI Agreements were assignable in order to negotiate a separate and more profitable agreement with Citadel.

* * *

Mr. Pirkle stated in his deposition:

They never contacted me to discuss what I would like to -- if I -- to discuss whether or not I even wanted to discuss what happens with the LMA. They tried to force me to do something that they knew I wouldn't want to do, and in their -- their -- in their arrogance and their egotism they attempted to roll right over me, and I wouldn't stand for it. . . .

When DBC formally notified the Pirkle Entities of its intent to assign the WOKI Agreements to Citadel and requested written consent for the assignment, Mr. Pirkle refused to sign. He sent a letter to Allen Dick stating "none of the Oak Ridge Contracts were assignable without permission." After this action was filed by DBC, the Pirkle Entities claimed in an answer as follows:

None of Defendants had ever heard of Citadel Broadcasting Company and/or Citadel Communications Corporation ("Citadel") until after Defendants learned that DBC had put its company up for sale in March 2000. Defendants subsequently learned that Citadel is a company headquartered in Las Vegas, Nevada which had been engaged in a rapid acquisition of radio stations in the United States since the mid 1990's, but had never engaged in the broadcasting business in Tennessee prior to year 2000 when it entered into agreements to acquire radio stations in eastern Tennessee, including Knoxville.

According to the Pirkle Entities, when they first entered into the WOKI Agreements, they entered into the contractual relationship with DBC because it was a local, closely held company with a proven track record as a successful broadcaster in the Knoxville market and a company that had demonstrated longevity as well as the ability to consistently develop, over time, its own radio properties. They contend their trust and confidence was understandably placed in DBC to protect the image and value of WOKI without any real need for ComCon's advice. They note that Citadel, on the other hand, had no prior connection with the Knoxville market. The company was quickly acquiring radio stations -- perhaps a risky financial business model. The Pirkle Entities contend that substituting Citadel for DBC as a party to the CA had the potential of materially increasing the burden imposed on ComCon under the

-4-

CA by requiring ComCon to provide Citadel extensive training on the workings of the Knoxville broadcast market.

DBC contends that the Pirkle Entities objected to assignment of the WOKI Agreements with the sole objective to negotiate more money for themselves. DBC argues, however, that the Pirkle Entities did not have the right under the WOKI Agreements to oppose a proposed assignment of the agreements as a leverage point to obtain more money. DBC asserts that two of the three WOKI Agreements (the TBA and the CA) contained no anti-assignment provision or requirement that DBC affirmatively obtain the Pirkle Entities' consent to a proposed assignment. Only the ROFR required the written consent of the Pirkle Entities for assignment.

In order to close the Citadel deal, DBC repeatedly requested that the Pirkle Entities consent to the assignment of the WOKI Agreements. To alleviate any purported concerns about Citadel's ability to perform under the agreements, DBC advised the Pirkle Entities that it would guarantee the obligations under the WOKI Agreements.[1] Thus, according to DBC, if the Pirkle Entities would have agreed to the assignments, their financial position would not have been subjected to any risk because DBC would have retained liability in the event of a default by Citadel. However, instead of cooperating, DBC relates that the Pirkle Entities injected themselves into the sale process by trying to negotiate directly with Citadel.

According to DBC, the actions of the Pirkle Entities ultimately cost it millions of dollars. Because of the controversy surrounding the WOKI Agreements,[2] Citadel would only close on the asset sale if $10,000,000 was deducted from the price. DBC further claims other expenses have been incurred amounting to well over a million dollars.

DBC filed suit asking the trial court to find that the TBA and the CA were at all times assignable by DBC to Citadel without the consent of the Pirkle Entities; that DBC rightfully requested the Pirkle Entities to consent to the assignment of the ROFR, but that the Pirkle Entities unreasonably withheld it; that the Pirkle Entities intentionally and falsely asserted that the TBA and CA gave them a right to consent to their assignment and then unreasonably withheld that consent, all in a ploy to work a new deal with Citadel; that, assuming the duty of good faith and fair dealing applies to the ROFR, the Pirkle Entities breached the duty as

[1]The Pirkle Entities dispute that DBC offered to guarantee the entire performance of all three of the WOKI Agreements. According to the Pirkle Entities, DBC only offered to guarantee the monthly payments due under the TBA.

[2]DBC asserted in the trial court that the assignment of all three of the contracts was required for the WOKI-FM portion of the asset transfer agreement between DBC and Citadel to be effective.

a matter of law; and that ComCon had breached the CA as a matter of law by objecting to the assignment when it had no right to consent or withhold consent to the assignment.

On July 7, 2010, the trial court ruled on competing motions for summary judgment filed by the parties. The court first addressed the ROFR, noting that DBC characterizes the assignment provision as a "silent consent" provision, "by which is meant that the provisions of the clause provide no language setting forth the circumstances under which consent may be withheld." The trial court held:

> . . . Because the language in the contract at issue is silent with regard to the circumstances under which consent to assignment of the ROFR may be withheld, the Plaintiff urges upon the Court the imposition of the "implied covenant of good faith and fair dealing" contained within the Restatement (Second) of Contracts at § 205 as adopted and applied by the Courts of the State [of] Tennessee.
>
> The Defendants for their part argue that the terms of the contract with regard to assignment are complete, unambiguous and should be enforced according to their literal terms. The Defendants point out, and it is conceded by the Plaintiff, that no Tennessee decision has imposed the "implied covenant of good faith and fair dealing" to an assignment clause, and that to do so here would result in the addition of new terms to an otherwise unambiguous contract. . . .
>
> While it is undoubtedly true that Tennessee has adopted § 205 of the Restatement (Second) of Contracts, and implies a covenant of good faith and fair dealing in all contractual relationships, that implied covenant should not be used to vary the terms of an otherwise clear and unambiguous agreement. . . .
>
> . . . In this particular case, the Court finds nothing ambiguous about the "silent consent" language in question. These parties, sophisticated business entities, were free to negotiate for and include within the language of the consent clause language to the effect that "consent shall not be unreasonably withheld" but chose not to do so. To imply a "reasonableness" standard to the decision of either party . . . to withhold consent to an assignment of the ROFR would be in effect to add a new provision to the contract which the parties were free to add themselves. To do so would, in the Court's opinion, run contra to the universally accepted [tenets] of contract interpretation . . . .

Additionally, it seems clear that Tennessee generally observes the principle that interests in property are to be freely useable and alienable. Thus, for example, in Tennessee leasehold interests are freely assignable by the lessee without consent of the lessor in the absence of contrary language within the lease, and covenants which restrict the right of assignment or subletting are strictly construed against the lessor. Generally speaking, Tennessee Courts strictly construe restrictions on the free use of property against the restrictions and such restrictions will not be extended by implication to anything not clearly and expressly prohibited by their plain terms. In the main, the cases relied upon by the Plaintiff involve "silent consent" clauses in real estate lease contracts. Implying a covenant of good faith and fair dealing in such contracts, in the Court's view, advances the underlying principle of the right of free use and alienation of property in that, in imposing a requirement of reasonableness upon a lessor's ability to deny the subletting or assignment of a lease, the lessor's ability to interfere with the lessee's free use or alienability of the leasehold estate is diminished.

A Right of First Refusal agreement, however, is *itself* a restraint on the free use and alienability of property, because in its absence a property owner would of course be empowered to sell his property to whomever he wished at whatever price he negotiated. Also, and unlike leasehold interests, ROFR agreements are considered to be personal in nature and not generally transferable or assignable unless such is specifically provided for in the ROFR contract. Thus in keeping with the general preference for the free use and alienability of property, a ROFR contract, as a restriction on the free alienability of property, should be strictly construed against restrictions on free alienability. Imposing a covenant of good faith and fair dealing upon a "silent consent" provision in an ROFR contract would have the effect of increasing the restrictions on free use and alienability of property, in that it would further limit the property owner's options in transferring his property as he sees fit. Again the Court would point out that these parties were free to include within the contract restrictions on the Defendants' right to withhold consent to the assignment of the ROFR but chose not to include such restrictions. To ask the Court now to impose such a restriction not only would result in the reformation of the contract by judicial *fiat*, but would also be contrary to the general rule that property owners ought [to] be free to dispose of their property as they wish, and that restrictions against that right should be strictly construed.

For the foregoing reasons, this Court will decline to superimpose a "reasonableness" requirement upon the assignment provision of the ROFR

contract. The clear language of the provision in question gives the parties the unrestricted right to refuse assignment of the contract, and the Court will enforce those provisions as written.

(Internal citations omitted).

The trial court further addressed whether, assuming a covenant of good faith and fair dealing could be implied under the circumstances, DBC had established a violation of the covenant:

Although the conclusion above essentially pretermits this issue, the Court will briefly address the Plaintiff's contention that the undisputed material facts of the case demonstrate that Plaintiff is entitled to a judgment as a matter of law. Plaintiff's argument in essence is that Defendant Pirkle has testified by affidavit and deposition that he was at least in part motivated to deny consent to assign the ROFR contract to Citadel because of his interest in making a more lucrative arrangement with Citadel. The Court need not pass on the question of whether such conduct would violate the covenant of good faith and fair dealing (even if it were to apply in this case) because in their response to the Plaintiff's Rule 56.03 Statement of Undisputed Material Facts the Defendants have disputed the allegation that the only reason they objected to the assignment of the contracts at issue was a desire for monetary gain; citing further testimony of Mr. Pirkle and that of Mr. Lewis [Cosby] the Defendants argue that they had valid business concerns regarding the financial status of Citadel and [its] ability to perform under the contracts. This, the Court finds, creates a material issue of fact rendering Summary Judgment for the Plaintiff[] on this issue unavailable.

The trial court held as follows regarding the CA:

The Defendants argue in their Motion for Partial Summary Judgment that even if a covenant of good faith is to be implied in the silent consent language of the ROFR and even if they violated the covenant by their behavior, the Consulting Agreement was a personal services contract that could not be assigned as a matter of law, and that therefore the WOKI-FM portion of the asset sale by DBC to Citadel could not be validly accomplished.

The Court is persuaded by the Plaintiff's argument that, assuming this contract is a personal services contract, "it is not the benefits of the contract that are

-8-

non-assignable, but the duties that are non-delegable." Even if the Court assumes that the CA was a personal services contract, DBC's only responsibility under the agreement was to pay for those services provided by the Defendants under the CA. The Court finds that DBC's interests in the CA were freely assignable without the consent of the Pirkle entities.

Plaintiff on the other hand argues that the covenant of good faith also applies to the CA, and that the Defendants' objection to the assignment of the CA to Citadel violates the covenant, citing § 205 of the Restatement (Second) of Contracts:

> *e. Good faith in enforcement.* The obligation of good faith and fair dealing extends to the assertion, settlement and litigation of contract claims and defenses. See, e.g., §§ 73, 89. The obligation is violated by dishonest conduct such as conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts.

REST 2d CONTR § 205. Plaintiff argues that when the Defendants objected to the assignment of the CA they were in violation of the covenant inasmuch as the Defendants had no right to so object.

The Court will begin by observing that Tennessee does generally recognize the implied covenant of good faith and fair dealing in most contractual enforcement, and the peculiar aspects of the ROFR consent language that the Court believes exempts those provisions from the general rule do not apply with regard to the CA. Therefore, the Court finds that the implied covenant of good faith does apply to the CA, which will be interpreted with the covenant's reasonableness requirements in mind. However, Plaintiff essentially urges a "strict liability" standard upon the Court with regard to the Defendants' conduct; if the Defendants insisted on a contractual right which they did not have, the argument goes, then they have violated the covenant of good faith, regardless of whether they had a good faith belief that they actually had the contract right upon which they were insisting or even if they were relying upon the advice of counsel in asserting the contract right. The Court does not believe that the restrictions of the covenant are that broad. The plain language of the Restatement provision relied upon by the Plaintiff speaks in terms of "dishonest conduct," "pretended disputes" and assertions "contrary to the understanding" of the asserter. All of these terms require the Court to make judgments about the state of mind of the Defendants at the time they

asserted their objections to the assignment of the CA. The Court is unwilling to find that a party may be held liable for a breach of contract for holding out a good faith but mistaken interpretation of a contract provision. A contrary holding would open a veritable Pandora's Box of litigation, rendering every losing party in a contract dispute potentially liable for a breach of contract based solely on the fact that the Court did not hold with that party's interpretation of a contract provision. The Court finds that this is a box best left closed. Because the Court finds that there is a material issue of fact presented regarding whether the Defendants' actions regarding the CA were undertaken in good faith, it follows that the Plaintiff would not be entitled to summary judgment on this issue.

(Internal citations omitted). Accordingly, the trial court found that "[t]he ROFR should be strictly construed against the restriction on sale, and the language of the ROFR contract is not vague or ambiguous and should be enforced on [its] terms"; that "[t]here is a material issue of fact regarding the intentions and motivations of the Defendants in refusing the assignment"; "[e]ven if [the CA] was a personal services contract, DBC had the right freely to assign its benefits under the contract to Citadel"; "[l]ike most contracts in Tennessee, the implied covenant would apply to the CA"; and "[a] material issue of fact [exists] regarding the state of mind and motivations of the Defendants in objecting to the assignment of the CA." The trial court noted that "if the Defendants had the right to refuse consent to assignment of any of the three contracts that constituted the relationship between DBC and WOKI-FM, the entirety of the Plaintiff's case must fail." The trial court found "that the Defendants had the right to refuse their consent to the assignment of the ROFR for any reason" and "that they can have no liability to DBC for the ensuing and resulting arrangements between DBC and Citadel." The court held "that summary judgment should be granted to Defendants and that this action must be dismissed." DBC subsequently filed this timely appeal.

## II. ISSUES

The issues raised by DBC are restated as follows:

A. Did the trial court err in ruling that the implied covenant of good faith and fair dealing does not apply to a "silent consent" provision regarding the assignability of a right of first refusal agreement?

B. Did the trial court err in ruling that, if the implied covenant of good faith and fair dealing applies to a "silent consent" provision regarding the

assignability of a right of first refusal, the Pirkle Entities proffered evidence sufficient to create a material issue of fact as to the intentions and motivations of the Pirkle Entities in refusing the assignment?

C.  Did the trial court err in ruling that a contracting party's state of mind and/or motivations are relevant in determining whether the party breached a contract by objecting to its assignment when the party had no contractual right to object?

D.  Did the trial court err in ruling that the Pirkle Entities proffered evidence sufficient to create a material issue of fact as to the state of mind and motivations of ComCon in objecting to the assignment of the Consulting Agreement?

## III.  STANDARD OF REVIEW

Our review is de novo upon the record of the trial court.  Tenn. R. App. P. 13(d).  The trial court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against those findings.  *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999).  The interpretation of a written agreement is a matter of law and not of fact.  Therefore, as to matters of law, our scope of review is de novo on the record with no presumption of correctness of the trial court's conclusion of law. *NSA DBA Benefit Plan, Inc. v. Connecticut Gen. Life Ins.* Co. 968 S.W.2d 791, 795-96 (Tenn. Ct. App. 1997); *Park Place Ctr. Enter. v. Park Place Mall Assoc.*, 836 S.W.2d 113, 116 (Tenn. Ct. App. 1992).

## IV.  DISCUSSION

DBC asserts that the ROFR in this case should be construed consistent with the covenant of good faith and fair dealing.  The Pirkle Entities argue that Tennessee law does not require them to have been reasonable when declining consent to the assignment of the ROFR.

It appears that the primary matter before us, the construction of a silent consent clause in an anti-assignment provision, is an issue of first impression in this state.  We have exhaustively reviewed this record, considered the positions of the parties, and analyzed countless cases from other jurisdictions. We conclude that a silent consent clause should be interpreted consistent with the duty of good faith and fair dealing, requiring the parties to act in a commercially reasonable manner when deciding whether consent to a proposed

assignment should be granted.

It is well settled in Tennessee that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Covington v. Robinson*, 723 S.W.2d 643, 645 (Tenn. Ct. App. 1986) (citing Restatement (Second) of Contracts § 205 (1979); *Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995) (quoting 17 Am. Jur. 2d *Contracts*, § 256 (1964)).

Our Supreme Court discussed the nature of the duty of good faith in *Wallace v. National Bank of Commerce*, 938 S.W.2d 684 (Tenn. 1996):

> In Tennessee, the common law imposes a duty of good faith in the performance of contracts. . . . The law regarding the good faith performance of contracts was well stated by the Court of Appeals in *TSC Industries, Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. App. 1987):
>
> > It is true that there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law. *See* Restatement (2d) Contracts, § 205 (1979). What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable.
>
> In *Covington v. Robinson*, 723 S.W.2d 643, 645-46 (Tenn. App. 1986), which was relied upon by the Court of Appeals in *TSC Industries*, Inc. *v. Tomlin*, the Court of Appeals held that in determining whether the parties acted in good faith in the performance of a contract, the court must judge the performance against the intent of the parties as determined by a reasonable and fair construction of the language of the instrument. In a later decision, the Court of Appeals held that good faith in performance is measured by the terms of the contract. "They [the parties] may by agreement, however, determine the standards by which the performance of obligations are to be measured." *Bank of Crockett v. Cullipher*, 752 S.W.2d 84, 91 (Tenn. App. 1988).

*Wallace*, 938 S.W.2d at 686.

A federal court applying Tennessee law has ruled that the duty of good faith and fair dealing imposes a reasonableness requirement in a silent consent clause generally. In *Town*

*& Country Equip., Inc. v. Deere & Co., Inc.*, 133 F.Supp.2d 665, 668-69 (W.D. Tenn. 2000), the plaintiff sued the defendant for breach of an agreement allowing sale of the defendant's products at the plaintiff's store. *Id.* at 667-68. The agreement contained a silent consent clause requiring the defendant's prior written approval before the plaintiff could relocate its store. *Id.* at 668. The court rejected the defendant's argument that the silent consent clause meant the defendant had "an absolute contractual right to withhold its approval of any relocation, for any reason." *Id.* at 669. Based on the duty of good faith and fair dealing, the district court found "[n]othing in the agreement suggests that [the defendant] may withhold that approval unreasonably," and denied summary judgment for the defendant on the plaintiff's claim that the defendant breached the contract by unreasonably withholding consent. *Id.* at 668-69, 673.

An increasing number of jurisdictions now hold that where a contract provides for assignment only with the prior consent of the grantor, such consent may be withheld only where the grantor has a commercially reasonably objection to the assignment. In *Homa-Goff Interiors, Inc. v. Cowden*, 350 So.2d 1035 (Ala. 1977), the Supreme Court of Alabama noted:

> The general rule throughout the country has been that, when a lease contains an approval clause, the landlord may arbitrarily and capriciously reject proposed subtenants. This rule, however, has been under steady attack . . . .
>
> * * *
>
> [W]e hold that, even where the lease provides an approval clause, a landlord may not unreasonably and capriciously withhold his consent to a sublease agreement. The landlord's rejection should be judged under a test applying a reasonable commercial standard. This question, of course, becomes a question of fact to be determined by the jury. . . .

*Id.* at 1037-1038 (internal citations omitted). Similarly, in *Julian v. Christopher*, 575 A.2d 735 (Md. 1990), the Maryland appellate court "recognized that in a lease, as well as in other contracts, "there exists an implied covenant that each of the parties thereto will act in good faith and deal fairly with the others." . . . [I]f the lease does not spell out any standard for withholding consent, then the implied covenant of good faith and fair dealing should imply a reasonableness standard." *Id.* at 739 (internal citations omitted).

Likewise, in *Warner v. Konover,* 553 A.2d 1138, 1140-1141 (Conn. 1989), the Connecticut Supreme Court held that a landlord who has discretion to withhold consent to lease assignments must exercise its discretion in such a way that is consistent with the duty of good faith and fair dealing. In *Warner*, the tenant sought to sell its business and assign

its lease during the fourth year of a five-year lease. The lease provided that the tenant could not assign the lease "without the prior written consent of Landlord." *Id.* at 1140 n. 1. The landlord refused to grant consent unless the parties renegotiated the rental. Connecticut's highest court held that a landlord may not unreasonably withhold its consent to the proposed lease assignment and that the landlord's refusal in this case was unreasonable. *Id.* at 1140-1141. Earlier, in *1010 Potomac Assocs. v. Grocery Manuf. of Am., Inc.*, 485 A.2d 199 (D.C. 1984), the District of Columbia Court of Appeals observed:

> [A] landlord may not for economic motives reasonably refuse consent to a sublease that fully protects the landlord's bargain under the prime lease. . . . [I]t is unreasonable for a landlord to withhold consent to a sublease solely to extract an economic concession or to improve its economic position. The purpose of the consent clause is protection of the landlord in its ownership and operation of the particular property, not protection of the landlord's general economic condition. The landlord has no reasonable basis for withholding consent if the landlord remains assured of all the benefits bargained for in the prime lease.

*Id.* at 209-10 (internal citations omitted).

In *Boss Barbara, Inc. v. Newbill*, 638 P.2d 1084 (N.M. 1982), the Supreme Court of New Mexico considered whether a landlord could unreasonably and arbitrarily withhold consent to a sublease. That court recognized that "the trend of the jurisdictions is to require the landlord to act reasonably when withholding consent . . . ." *Id.* at 1085 (citing *Homa-Goff Interiors, Inc. v. Cowden*, 350 So.2d 1035 (Ala. 1977). The court noted as follows:

> [A] lease, being a contract, should be governed by general contract principles of good faith and commercial reasonableness. . . .
>
> New Mexico law has consistently required fairness, justice and right dealing in all commercial practices and transactions. . . .
>
> . . . In this case, the tenant could not sublease the property without the written consent of the landlord. The lease provision neither restricts the landlord's power to withhold consent unless he has reasonable cause, nor does the provision permit the landlord to unreasonably and arbitrarily withhold consent to a sublease agreement. However, in the absence of more specific language, and because of new Mexico's requirement that commercial transactions be guided by right dealing and fairness, we construe Paragraph IX to require that the landlord act reasonably when withholding his consent to a sublease

-14-

agreement.

*Id.* at 1086 (internal citations omitted).

In *Funk v. Funk*, 633 P.2d 586 (Idaho 1981), the Idaho Supreme Court noted that "no desirable public policy is served by upholding a landlord's arbitrary refusal of consent merely because of whim or caprice or where, as here, it is apparent that the refusal to consent was withheld for purely financial reasons and that the landlord wanted the lessees to enter into an entirely new lease agreement with substantial increased financial benefits to the landlord. . . . *Id.* at 589 (internal citations omitted).

A sampling of cases supporting the position we take today include the following: *Pacific First Bank v. New Morgan Park Corp.*, 876 P.2d 761 (Or. 1994)*; Carma Developers (California) Inc. v. Marathon Dev. California*, *Inc.* 826 P.2d 710 (Cal. 1992); *Newman v. Hinky Dinky Omaha-Lincoln, Inc.*, 427 N.W.2d 50 (Neb. 1988)*; Kendall v. Pestana, Inc.*, 709 P.2d 837 (Cal. 1985); *Prince v. Elm Inv. Co.*, 649 P.2d 820 (Utah 1982)*; Warmack v. Merchants Nat'l Bank of Fort Smith*, 612 S.W.2d 733 (Ark. 1981); *Hendrickson v. Freericks*, 620 P.2d 205 (Alaska 1980); *Brown v. First Fed. Sav. & Loan Ass'n*, 460 P.2d 97, 100 (Mont. 1969); *Campbell v. Westdahl*, 715 P.2d 288 (Ariz. Ct. App. 1985); *Jack Frost Sales, Inc. v. Harris Trust & Sav. Bank* 433 N.E.2d 941, 949 (Ill. Ct. App. 1982); *Fernandez v. Vazquez*, 397 So.2d 1171 (Fla. Ct. App. 1981); *Arrington v. Walter E. Heller Int'l Corp.*, 333 N.E.2d 50 (Ill. Ct. App. 1975); *Shaker Bldg. Co. v. Federal Lime & Stone Co.*, 277 N.E.2d 584 (Ohio Misc.1971).

Admittedly, there are cases that hold otherwise. Some jurisdictions still hold onto the older view that consent may be withheld without justification and do not recognize a general duty of good faith implied in all contracts. *See, e.g., First Fed. Sav. Bank of Indiana v. Key Mkts, Inc.*, 559 N.E.2d 600 (Ind. 1990).

We hold that under a silent consent clause in an anti-assignment provision, a party may not withhold consent without a good faith and commercially reasonable basis for objecting to the assignment. This obligation arises from the duty of good faith and fair dealing, and a breach of the obligation is a breach of contract. Accordingly, we hold that the Pirkle Entities had a duty to consent to DBC's proposed assignment of the ROFR unless they had a good faith and commercially reasonable basis for objecting to the assignment.

## V. CONCLUSION

In view of our holding on the first issue, the trial court erred in granting summary

judgment to the Pirkle Entities. We reverse the judgment of the trial court and remand for further proceedings in accordance with this opinion. We pretermit consideration of the remaining issues, as in our view, they can be resolved upon remand of the case. Costs on appeal are taxed to appellees, Oak Ridge FM, Inc., ComCon Consultants, and John W. Pirkle.


_____
JOHN W. McCLARTY, JUDGE